# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Steven C. Mannion |
| v. | : Mag. No. 19-6194 |
| MATTHEW S. ELLIS | : **CRIMINAL COMPLAINT** |

I, Brian Dyson, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Brian Dyson, Special Agent
U.S. Department of Health and Human
Services, Office of Inspector General

Sworn to before me, and
subscribed in my presence

July 3, 2019 at
Newark, New Jersey

HONORABLE STEVEN C. MANNION
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer

## ATTACHMENT A

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud)

From at least as early as in or about October 2018 through in or about the present, in the District of New Jersey and elsewhere, defendant

## MATTHEW S. ELLIS

did knowingly and intentionally conspire and agree with EDWARD KOSTISHION, KACEY PLAISANCE, and others to execute a scheme and artifice to defraud the Medicare program, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment of health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Brian Dyson, a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General, having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

**Relevant Individuals and Background Information**

1. At all times relevant to this Criminal Complaint:

    a. Defendant MATTHEW S. ELLIS ("ELLIS") was a medical doctor based in Gainesville, Florida with a National Provider Identification ("NPI") number assigned to him as a certified medical care provider. Defendant ELLIS was permitted to use his NPI number to bill, and participate in the billing of, health care benefit programs, including the Medicare program, for legitimate medical services that were rendered to and ordered for patients to whom defendant ELLIS provided medical care.

    b. EDWARD KOSTISHION ("KOSTISHION"), a resident of Lakeland, Florida, and KACEY PLAISANCE ("PLAISANCE"), a resident of Altamonte Spring, Florida, were the Managing Partners of Ark Laboratory Network LLC ("Ark Lab Net").[1]

    c. Ark Lab Net purported to operate a nationwide network of laboratories and laboratory partners that facilitated genetic testing. Ark Lab Net's primary business premises was KOSTISHION's residence in Lakeland, Florida. Defendant ELLIS served as the Chief Medical Officer for Ark Lab Net.

    d. The "Distributor Company," in partnership with Ark Lab Net, facilitated genetic testing by, among other things, coordinating health events and health fairs related to genetic testing, reviewing medical histories and medications with patients, administering DNA specimen collection by way of oral buccal swabs, and by advocating for genetic testing as a means of preventative

---

[1] On January 15, 2019, KOSTISHION and PLAISANCE were charged by complaint in this District with conspiracy to commit heath care fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349, in connection with their participation in the conspiracy set forth in this Complaint. *See U.S. v. Kostishion and Plaisance*, Mag. No. 19-4015 (MAH).

medicine. Defendant ELLIS served as the Chief Medical Officer for the Distributor Company.

    e. The "Clinical Laboratory" was a clinical laboratory located in New Jersey that, among other things, performed clinical laboratory genetic testing, including genomic cancer screening tests.

    f. Genetic testing utilizes laboratory methods to analyze genes, which are a portion of one's hereditary DNA code that contributes to, among other things, one's phenotypic traits. Genetic tests can be used to identify health risks, such as a patient's risk for certain types of cancers as the result of DNA mutations. One method of conducting genetic testing is to obtain a DNA sample from a patient using a cheek (buccal) swab that is sufficient to obtain a genetic profile. The DNA swab is then submitted to a clinical laboratory, such as the Clinical Laboratory, for analysis and the results are sent back to the health care provider that deemed the testing to be medically reasonable and necessary.

    g. The Medicare program is a federal program established by the Social Security Act of 1965 (codified as amended in various sections of Title 42, United States Code) to provide medical services, medical equipment, and supplies to aged, blind, and disabled individuals who qualify under the Social Security Act. The Medicare Part B program is a federally funded supplemental insurance program that provides supplementary Medicare insurance benefits for individuals aged sixty-five or older and certain individuals who are disabled.

    h. The Medicare Part B program excludes from coverage diagnostic tests, which include genetic tests, "that are not reasonable and necessary . . . [f]or the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15(k)(1). In order to be considered "reasonable and necessary," Medicare rules require that genetic testing "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."[2] *Id.*

---

[2] Non-physician practitioners, such as clinical nurse specialists or physicians assistants, may also order genetic tests but are subject to the same requirement as physicians: they must consult or treat the beneficiary for a specific medical problem and use the test results to manage the beneficiary's specific medical problem. 42 C.F.R. 410.32(a)(2).

**The Conspiracy to Defraud**

2. In or about October 2018, KOSTISHION and PLAISANCE contacted an employee of the Clinical Laboratory with a business proposal. KOSTISHION and PLAISANCE proposed an arrangement by which Ark Lab Net would provide ten DNA swabs to the Clinical Laboratory in return for payment of approximately 50% of the total Medicare billings realized by the Clinical Laboratory as a result of the genetic tests.

3. On or about November 16, 2018, KOSTISHION sent via email to an employee at the Clinical Laboratory ten requests for clinical cancer genetic tests, with the intent that the Clinical Laboratory would bill such tests to Medicare. The forms were entitled "Test Request Form and Statement of Medical Necessity" (the "Test Requests"). Each of the Test Requests contained patient health information, including the patient's name, date of birth, the medical condition purportedly justifying the requested cancer genetic test, and the patient's Medicare identification number.

4. Defendant ELLIS was listed on each of the Test Requests as the "Ordering Physician." The Test Requests contained a certification at the bottom for the "Ordering Physician" to confirm that the cancer genetic tests were medically reasonable and necessary. Specifically, the certification contained the following language:

> I have supplied information to the patient regarding genetic testing and the patient has given consent for genetic testing to be performed. I further confirm that this test is medically necessary for the diagnosis or detection of a disease, illness, impairment, symptom, syndrome or disorder, and the results will be used in the medical management and treatment decisions for the patient. I confirm that the person listed in the Ordering Physician space above is authorized by law to order the test(s) requested herein.

5. The Test Requests contained fraudulent information regarding the patients' medical histories and conditions, and falsely represented that defendant ELLIS provided the patients with information regarding genetic testing and that the genetic tests were medically necessary. For example, in one of the Test Requests relating to "Patient 1," the Test Request indicated that Patient 1 had a personal history of breast cancer at age 44, a prerequisite for Medicare coverage of the particular test. However, on or about November 29, 2018, Patient 1 confirmed that the information on the Test Request was false. According to Patient 1, s/he stated that s/he never had any type of cancer in his/her life, and that s/he never told anyone that s/he had cancer at any point in his/her life.

6. Additionally, Patient 1 stated that s/he submitted to the DNA swab because s/he saw an advertisement on Facebook that offered a $100 gift card for patients interested in genetic testing. Patient 1 stated that the DNA swab

was not taken at a medical or doctor's office but rather in a "plain old office building" and that "some random guy" took the swab. S/he confirmed that s/he never saw or spoke to his/her treating physician about the genetic testing, and never saw or spoke to defendant ELLIS, the Ordering Physician listed on the Test Request. Two other patients in the Test Requests were contacted, and both confirmed they never saw or spoke to any physician in connection with the genetic tests, let alone defendant ELLIS, the Ordering Physician listed on the Test Requests.

7. Notably, defendant ELLIS, the Ordering Physician on all the Test Requests, practices medicine in Florida, but Patient 1 was located in Oklahoma. Indeed, all ten of the patients in the Test Requests were located in Oklahoma, Arizona, Tennessee, or Mississippi. None of the patients were located in Florida. Additional investigation revealed that defendant ELLIS was not licensed to practice medicine in Oklahoma.

8. The Distributor Company obtained the DNA swabs to which the Test Requests related without the involvement of defendant ELLIS or any other health care professional fulfilling the role of a treating provider. In addition to the initial ten, the Distributor Company obtained at least eighty more DNA swabs, which it sent to the Clinical Laboratory for genetic testing with the intent that the Clinical Laboratory would bill Medicare for such testing without any health care professional examining or even speaking with the patients.

9. Indeed, the DNA swabs were collected before defendant ELLIS or any other health care professional ever considered whether such tests were medically necessary or appropriate. For example, in or about November 2018, in a recorded telephone conversation, PLAISANCE acknowledged that "technicians"—not a physician or authorized health care professional—conducted a "medical intake process," after which the "technicians" took the DNA swabs. According to PLAISANCE, *after* the technicians obtained the DNA swabs, the medical notes were sent to defendant ELLIS, the Ordering Physician, who reviewed the notes through an electronic portal and ordered the tests. PLAISANCE acknowledged that defendant ELLIS never examined, consulted, or even spoke to the patients directly, as indicated on the Test Requests.

10. On or about January 7, 2019, Ark Lab Net received payment of approximately $36,860.52, which reflected Ark Lab Net's percentage portion of the total Medicare billings relating to the ten Test Requests. KOSTISHION previously provided Ark Lab Net's bank account information to the Clinical Laboratory. KOSTISHION and PLAISANCE took payment without ever receiving the test results for the genetic tests ordered in connection with the Test Requests.

11. On or about January 10, 2019, in a recorded telephone conversation, defendant ELLIS admitted that, in his role as Chief Medical Officer for Ark Lab Net and the Distributor Company, he oversaw the process through which Ark Lab Net and the Distributor Company acquired and "qualified"

patients for genetic testing. Defendant ELLIS further described how Ark Lab Net and the Distributor Company were developing the business relationship and "getting ready to go big with this."

12. On or about January 16, 2019, law enforcement agents approached defendant ELLIS and interviewed him at his office in Gainesville, Florida. Among other things, defendant ELLIS stated that:

- Ark Lab Net merged with the Distributor Company;
- PLAISANCE indicated to defendant ELLIS that Ark Lab Net needed medical orders so that the genetic tests would be considered medically valid;
- Ark Lab Net and the Distributor Company hired defendant ELLIS to serve as the Chief Medical Officer for which defendant ELLIS was being paid $5,000 per month; and
- The Distributor Company's personnel recruited a few hundred patients per month for genetic tests through various methods, gathered medical information about the patients, and captured the DNA specimen from the patients.

13. In addition, defendant ELLIS admitted to law enforcement during this interview that he:

- Was aware that he was listed as the ordering physician for the genetic tests for patients that the Distributor Company acquired;
- Knew that some of the patients for whom tests were ordered were Medicare beneficiaries;
- Never reviewed the results of the genetic tests that he ordered for the patients; and
- Never spoke to any of the patients for whom he ordered genetic testing.

14. During the interview, law enforcement agents read language to defendant ELLIS from 42 C.F.R. 410.32, which states, in substance, that the physician who orders diagnostic tests must be the physician who treats the patient for a specific condition. Law enforcement agents then asked defendant ELLIS if he was ordering the test but was not actually treating the patients for any medical condition. Defendant ELLIS replied, "technically, yes" and admitted that "our intentions were good, but how it's being carried out, not so much." Defendant ELLIS further admitted that he "knew absolutely" that genetic tests were prohibited as a screening tool.